OPINION OF THE COURT
Edward M. Kaufmann, J.
Petitioner seeks an order of filiation and an order of visitation for an 11-year-old child born as a result of respondent’s *859 successful insemination of herself with his sperm. Since her birth, the child has lived with respondent, respondent’s lesbian partner, and the partner’s biological child, also born as a result of artificial insemination with the semen of a known donor.
I.
Respondent Robin Y. and Sandra R. met in 1979. They established and have maintained to this day an exclusive lesbian relationship.
Early in their relationship, they decided to have children, and also decided that Sandra R., the older of them, would have a child first. They enlisted the help of a gay man, Jack K. Sandra R., Robin Y. and Jack K. agreed that Robin Y. and Sandra R. would raise, as coparents, a child born of the insemination of Sandra R. with Jack K.’s sperm; that Jack K. would have no parental rights or obligations; and that Jack K. would make himself known to the child if the child ever made inquiry about her biological origin. Sandra R. and Robin Y. asked Jack K. to make himself known to the child at a future time because they feared that the child might suffer emotional pain if she did not know the identity of her father.
Cade R.-Y. was born on May 18, 1980, as a result of Sandra R.’s artificial insemination[1] with Jack K.’s[2] sperm. Cade was given the last names of Sandra R. and Robin Y. to indicate that Sandra R. and Robin Y. considered her the equal daughter of each of them.
Shortly after Cade’s birth, Sandra R. and Robin Y. decided that Robin Y. should have a child. They again enlisted the help of a gay man, petitioner Thomas S. They met with him *860 at his office and reached agreement on the principles which they intended would govern their future relationship. It was agreed that a child born of the insemination would be raised by Sandra R. and Robin Y. as coparents and as Cade’s sister; that petitioner would have no parental rights or obligations; and that he would make himself known to the child if the child asked about her biological origin.
Although Thomas S. and Sandra R. are attorneys, neither sought legal advice or attempted to put the agreement in writing. They and Robin Y. were unaware that California had enacted legislation that might have been utilized to sever Thomas S.’s parental rights.[3]
When they met in Thomas S.’s office, Robin Y. and Sandra R. resided in New York and Thomas S. resided in California. Robin Y. traveled to California for the successful insemination in February 1981.[4] She inseminated herself with petitioner’s sperm, following the instructions of her New York physician. She then returned to New York.
In July 1981, Robin Y., Sandra R. and Cade moved to San Francisco, California. Although Thomas S. also lived in San Francisco, he had little contact with them.
Ry R.-Y. was born on November 16, 1981, in San Francisco. Ry, like Cade, was given the last names of Sandra R. and Robin Y. to indicate that Sandra R. and Robin Y. considered her the equal daughter of each of them. Sandra R. and Robin Y. paid all expenses of Ry’s birth, and have jointly supported her all of her life.
In July 1982, Sandra R., Robin Y. and the children moved back to New York. Until February 1985, they had virtually no contact with Thomas S. Thus, he did not hear about Ry’s early development.
In early 1985, Cade, then almost five years old, began to ask about her biological origins. Robin Y. and Sandra R. contacted Jack K. and Thomas S., "the men who helped make them”, as *861 they referred to them to the children, and asked whether they would meet the children, as they had agreed to do. They agreed to do so, and Robin Y., Sandra R. and the children traveled to San Francisco for the meeting. They spent time together in San Francisco and at a rented beach house near San Francisco. It was a happy encounter which led to a continuing relationship.
In 1985, Robin Y. and Sandra R. told Thomas S. that they expected him to honor his agreement to treat them as comothers to both girls. They also told him that they expected him to treat Cade as Ry’s sister. Later, when it became apparent that Jack K. had a drinking problem and could not give sufficient attention to Cade, they asked Thomas S. to treat Ry and Cade equally. He agreed to their requests.
Between 1985 and 1991, Thomas S. visited with Robin Y., Sandra R. and the girls several times a year.
All contacts between Thomas S. and the girls were at the complete discretion of Robin Y. and Sandra R. At first, Thomas S. apparently found it relatively easy to agree to this. As the years went by, however, he found it increasingly burdensome. He felt, increasingly, that he was being forced to follow unreasonable instructions in order to visit with his biological daughter, Ry. He also found it difficult to treat Ry, his biological daughter, as Cade’s equal. He was not able to put biology aside, as Robin Y. and Sandra R. demanded. In late 1990 or early 1991, he decided to insist on visitation with Ry outside the mothers’ presence. He wanted to introduce Ry to his biological relatives and was not comfortable including Robin Y. and Sandra R. in the introductions. Realizing that a request to visit Ry without Cade would be automatically rejected, and probably, also because he did not want to hurt Cade’s feelings, he requested that both girls visit with him and his biological family without the mothers in California in the summer of 1991. He commenced this proceeding when the mothers refused his request.[5]
Since their return to New York in July 1982, Sandra R., Robin Y. and the girls have lived together in Manhattan. Sandra R. works as an attorney. Robin Y. works inside the home, and also manages the apartment building they own and reside in.
*862 . Ry and Cade attend private school. The tuition for both girls is paid by Sandra R.’s mother, who both girls regard as their grandmother. Robin Y. and Sandra R. are active in the girls’ school community, and socialize with parents of the girls’ school friends. The school treats Robin Y. and Sandra R. as comother of each girl. The girls have done very well at school, and in their peer relationships.
Ry and Cade at this point in their lives are well-adjusted children. They have been subjected to teasing by other children on a few occasions, but have handled this well.
Ry and Cade regard each other as sisters, and have a very close, warm relationship. Both girls call Robin Y. and Sandra R. "Mommy”.
Robin Y. and Sandra R., who had always felt vulnerable as lesbian mothers raising children, were angry and terrified when Thomas S. commenced this proceeding. They had believed that Thomas S. could be trusted not to question their legal status. Now they worried that they would be ordered to deliver Ry to California in August 1991, as the legal papers requested, and that more extensive visitation orders would follow. They worried that, were Robin Y. to die, Thomas S. or his biological family might seek custody of Ry. They worried, too, that Ry might be exposed to people who might question and undermine the concept of family they had worked to instill in the children — two lesbian mothers raising two children, equally, and two children responding to each other as sisters and responding to two mothers, equally, without regard to biological ties.
Robin Y. and Sandra R. talked about their anger and fears with each other, their friends, their attorneys, and the children. The children also expressed their anger and fear. All contact with Thomas S. was severed. Since this proceeding was commenced, Thomas S. has seen Ry on only one occasion. This was when I ordered that she be interviewed in his presence by a psychiatrist. Ry refused to stay in the interview room for more than a few minutes.
The parties and Law Guardian agreed to retain a psychiatrist, Dr. Myles Schneider, to conduct an evaluation and make recommendations to the court. Dr. Schneider recommended that there be no declaration of paternity and no court-ordered visitation.
Ry, Dr. Schneider said, considers Sandra R. and Robin Y. to be her parents and Cade to be her full sister. She understands *863 the underlying biological relationships, but they are not the reality of her life. The reality of her life is having two mothers, Robin Y. and Sandra R., working together to raise her and her sister. Ry does not now and has never viewed Thomas S. as a functional third parent. To Ry, a parent is a person who a child depends on to care for her needs. To Ry, Thomas S. has never been a parent since he never took care of her on a daily basis.
Ry, Dr. Schneider said, views Robin Y. and Sandra R. as having a relationship with each other that should be given respect. She knows that she, Cade and her mothers comprise an unusual and unconventional family. She knows that some outside her family have often shown intolerance and insensitivity toward her family. Notwithstanding this intolerance, Ry’s own view of her family is that of a warm, loving, supportive environment.
Ry, he said, views this court proceeding as an attack on and threat to her positive image of herself and her family. Her sense of family security is threatened. She has expressed fear of ongoing court involvement and worries about a confusing and threatening period in her family’s life. She fears that Thomas S. might seek custody of her. She has described to Dr. Schneider anxiety and nightmares about the court proceeding.
Ry does not want to visit Thomas S. Even the prospect of a visit with him causes Ry much anxiety, and Dr. Schneider believes that she would only visit with him if she were dragged to him kicking and screaming. Therapeutic intervention, he said, would not change her attitude. Any forced visitation would cause her increased anxiety, and would also do nothing to repair her relationship with Thomas S.
Dr. Schneider does not believe that Ry has been "brainwashed” into expressing her views. Of course, he recognizes, as I do, that her views have been shaped by the views of Robin Y. and Sandra R.
Thomas S. apparently believes that Ry, as his biological child, must feel fatherly affection for him. He is incorrect, I think. Ry has been brought up to view Robin Y. and Sandra R. as equal mothers raising two children and to view Thomas S. as an important man in her family’s life. In her family, there has been no father. Robin Y. and Sandra R. are deeply committed to this concept of their family, and Ry, who has been raised by them, must also be committed to the concept at this point in her life.
*864 I do not believe, however, as Robin Y. and Sandra R. state, that Thomas S. was not closer to Ry than many family friends. I think that Ry must have sensed Thomas S.’s affection for her. But this does not mean that she ever viewed him as a parental figure. For Ry, such a view would have been disloyal to her family and inconsistent with the reality of her life.
II.
Petitioner contends that, as Ry’s proven biological father at this proceeding, he is absolutely entitled to an order of filiation, and also entitled to an order of visitation. Respondent and the Law Guardian argue that, under the circumstances here, petitioner should be equitably estopped from a declaration of paternity.
A.
Petitioner, respondent and Ry submitted to blood genetic marker tests (see, Family Ct Act § 532). The results of these tests, recognized to be highly accurate on the issue of paternity (Matter of Tamara B. v Pete F., 146 AD2d 487, amended 157 AD2d 636, affd after remand 185 AD2d 157), indicate a statistical 99.98% probability of petitioner’s paternity. The results of the tests, along with the other evidence at trial, establish by clear and convincing evidence that petitioner is Ry’s biological father.
B.
Petitioner argues that Family Court Act § 542 requires me to enter an order of filiation.
Family Court Act § 542 reads: "If the court finds the male party is the father of the child, it shall make an order of filiation, declaring paternity.” While it has been held that Family Court is required by section 542 to enter an order of filiation where paternity is established by clear and convincing evidence (Matter of John H. v Suffolk County Dept. of Social Servs., 174 AD2d 669; Matter of Jean C. v Andrew B., 86 AD2d 891), even where the child’s mother opposes entry of the order (Matter of Leromain v Venduro, 95 AD2d 80), these cases did not involve instances where a putative father is barred from establishing his paternity by statute (see, Family Ct Act § 517; Domestic Relations Law §§ 73, 117 [1] [a]), or by application of the doctrine of equitable estoppel.
*865 C.
The doctrine of equitable estoppel applies to circumstances ' where the action or inaction of one party induces reliance by another to his or her detriment (see, Nassau Trust Co. v Montrose Concrete Prods. Corp., 56 NY2d 175), or where the failure of a party to assert a right promptly has created circumstances rendering it inequitable to permit exercise of the right after a lapse of time (see, 57 NY Jur 2d, Estoppel, Ratification, and Waiver, § 27).
The doctrine has been utilized in proceedings involving domestic disputes, notably paternity proceedings.
Thus, courts have equitably estopped a mother from repudiating the legitimacy of a child born during a marriage, under circumstances where she has encouraged and fostered a parental bond (citations omitted). Courts have also estopped a husband, former husband or adjudicated father from challenging paternity to avoid a support obligation, under circumstances where the child’s emotional well-being would be undermined (citations omitted).
Increasingly, courts have also utilized the doctrine to defeat attempts to establish paternity (Purificati v Paricos, 154 AD2d 360; Matter of Ettore I. v Angela D., 127 AD2d 6).
Petitioner would have me focus on language in these cases that speaks about "branding” a child "illegitimate” (e.g., Purificati v Paricos, supra, at 362). While the cases contain such language, the overriding rationale for these decisions has been to "zealously safeguard the welfare, stability and best interests of the child” (Matter of Ettore I. v Angela D., supra, at 13). This is accomplished by maintaining functional parent-child bonds when there are untimely or inappropriate attempts to repudiate or establish paternity, or when these attempts would damage the psychological well-being of the child.
III.
A review of the case law applying the equitable estoppel doctrine to paternity proceedings reveals no fact pattern quite comparable to the facts of this case. This is not surprising. The R.-Y. family was among the first lesbian mother families created by artificial insemination. Until the late 1970’s and 1980’s, lesbian mothers were primarily women who had given birth to children in the context of heterosexual marriages. *866 Beginning at that time, lesbians who became comfortably settled in their lesbian identities, and who no longer considered lesbianism and motherhood incompatible, created families through adoption, intercourse with a friend, and artificial insemination (see, Polikoff, This Child Does Have Two Mothers: Redefining Parenthood to Meet the Needs of Children in Lesbian-Mother and Other Nontraditional Families, 78 Geo LJ 459, 464-467 [1990]).
Ideally, the recognition of new and complex parenting arrangements is addressed by legislation. There is no legislation, however, that resolves the dispute before me, and I must proceed to resolve it under common-law principles. One of those principles, equitable estoppel, has been utilized by the courts to decide paternity proceedings for families whose reality is more complex than a one mother, one father biological model. I see no reason for not utilizing the doctrine to resolve this proceeding.
Here, from the outset, Thomas S. said that he had no interest in exercising parental rights. Had it been otherwise, Robin Y. would not have chosen him as a sperm donor. His conduct for the next decade confirmed his earliest representations. He did not pay any expenses of the pregnancy. He has never provided financial support. He took no action to establish paternity, at an early time in Ry’s life, when he might have established a parental relationship without causing her psychological harm. He did not attempt to see Ry at all for the first three years of her life, until Robin Y. asked him to do so and traveled to California with Ry for the visit.
Even after Thomas S. met Ry, he allowed his contacts with her to be at Robin Y.’s complete discretion. He knew full well, from 1985 on when he visited with Ry, that she had already developed and was continuing to develop a parental bond to Sandra R., as a second mother, and a sibling relationship with Cade. For many years, he outwardly supported the development of these functional family relationships. When Ry was almost 10 years old, he decided, due to changes in his life, to attempt to change the ground rules of her life.
This attempt has already caused Ry anxiety, nightmares and psychological harm. Ry views this proceeding as a threat to her sense of family security. For her, a declaration of paternity would be a statement that her family is other than what she knows it to be and needs it to be.
To Ry, Thomas S. is an outsider attacking her family, *867 refusing to give it respect, and seeking to force her to spend time with him and his biological relatives, who are all complete strangers to her, for his own selfish reasons.
A declaration of paternity naming Thomas S. as Ry’s father, under these circumstances, at this late time in her life, would not be in her best interests. Even were there an adjudication of paternity, I would deny Thomas S.’s application for visitation (see, Family Ct Act § 549 [a]).
Accordingly, the proceeding is dismissed.
[Portions of opinion omitted for purposes of publication.]

. Artificial insemination of humans may be of two types: insemination of a married woman with semen from her husband, called homologous insemination or "AIH”, and insemination of a woman with the semen of a donor not married to her, called heterologous or donor insemination or "AID” (Annotation, Rights and Obligations Resulting from Human Artificial Insemination, 83 ALR4th 295, 300; see also, 1 Schmidt’s Attorneys’ Dictionary of Medicine A-395 [Matthew Bender 1991]). Heterologous or donor insemination can generally be of two types: sperm donated by an unknown male, typically through a sperm bank; or sperm which is donated by a male known to the recipient. Artificial insemination is a relatively simple procedure, not requiring the assistance of a physician (see, Jhordan C. v Mary K., 179 Cal App 3d 386, 395, 224 Cal Rptr 530, 535 [Ct App 1986]; 2 Schatkin, Disputed Paternity Proceedings § 30.03 [3] [4th rev ed]).

. Jack K. is gravely ill with AIDS. He has never challenged the status of Sandra R. and Robin Y. as Cade’s parents.

. See, California Civil Code § 7005.

. The actual place of Ry’s conception is not relevant to the outcome of this proceeding. The California statute, Civil Code § 7005, is applicable to both married and unmarried women who bear children conceived through artificial insemination (Jhordan C. v Mary K., 179 Cal App 3d 386, 392, 224 Cal Rptr 530, 534, supra), where the terms of the statute are strictly complied with. Here, as in Jhordan C., the donor’s sperm was not provided to a licensed physician, as required by California Civil Code § 7005 (b), so as to statutorily bar the donor from asserting parental rights (see, supra, 224 Cal Rptr, at 533-534). The New York statute, Domestic Relations Law § 73, only addresses artificial insemination of married women.

. Thomas S. tested HIV positive in 1987. Perhaps because he knows that his years are limited, he wishes at this time to redefine his role in Ry’s life.