■ In the Matter of THOMAS S., Appellant, v ROBIN Y., Respondent. [618 NYS2d 356] —Order of the Family Court, New York County (Edward Kaufmann, J.), entered April 13, 1993, which denied petitioner's application for an order of filiation and visitation with Ry R.-Y., and which dismissed the petition, reversed, on the law, without costs, and the matter remanded for entry of an order of filiation and for reassignment for further proceedings pursuant to part 4 of article 5 of the Family Court Act, including a hearing on the issue of visitation.

This appeal presents the narrow issue of whether a sperm donor who is known to his child as her father and who, despite residing in California, has had considerable contact with her at the instance of her mother, is entitled to an order of filiation, as mandated by Family Court Act § 542. We hold that he is. The broader issue of visitation, while argued

extensively in the briefs, has not been adequately explored, and we therefore remand this issue for a hearing.

The child, Ry R.-Y., now 12 years old, lives with her mother, respondent Robin Y., the mother's lifetime companion, Sandra R., and Sandra's child, Cade, now 14, who was also conceived through artificial insemination by a donor known to her mother. Petitioner, who is also gay, was sought out by Robin Y. as a known donor and, after several attempts in both New York and California, Robin Y. successfully inseminated herself with petitioner's semen in February 1981 at the home of a mutual friend.

Ry was born on November 16, 1981 in San Francisco, where the household temporarily relocated in connection with Sandra R.'s employment. Like Cade, Ry was given the last names of R. and Y. Petitioner is not listed on Ry's birth certificate, and R. and Y. paid all expenses associated with the pregnancy and delivery. Petitioner was, however, informed of the birth and brought congratulatory flowers to R. and Y.'s home. Later that year, the household moved back to New York where they currently occupy an apartment located in a building owned by Sandra R.

For the first three years of her life, petitioner saw Ry only once or twice while in New York on business. In accordance with an oral agreement with R. and Y., he did not call, support or give presents to her during this period. When Cade, at the age of approximately five years, started asking questions about her father, R. and Y., as they had agreed between themselves, made arrangements for Ry and Cade to meet their biological fathers.

Petitioner testified that there were approximately 26 visits with the R. and Y. family over the following six-year period, ranging in duration from a few days to two weeks. Robin Y. estimates that appellant spent a total of 60 days with the R.-Y. family over the course of those six years, and petitioner estimates 148 days. Whatever the figure, it appears that all parties concerned developed a comfortable relationship with one another. Photographs included in the exhibits depict a warm and amicable relationship between petitioner and Ry, and there are numerous cards and letters from Ry to petitioner in which she expresses her love for him.

In July 1990, petitioner asked Robin Y. for permission to take Ry and Cade to see his parents and stay at a beach house with some of his siblings and their children. It seems that petitioner felt awkward about introducing R. and Y. to his

parents. R. and Y., however, were not willing to allow petitioner to take the girls unless the mothers accompanied them.

It was apparently during the course of these negotiations that petitioner revealed his desire to establish a paternal relationship with Ry. Y. and R. regarded this as a breach of their oral agreement, insisting that visitation continue on the same terms as over the past six years, *viz.,* with their supervision. They also rejected petitioner's suggestion to consult a family counselor or mediator. Unable to resolve his differences with R. and Y. and unable to see his daughter for a period of several months, petitioner moved, by order to show cause, for an order of filiation and for visitation.

During the course of the proceedings, Family Court ordered blood tests and a psychiatric evaluation of Ry. Petitioner, Robin Y. and Ry all submitted to blood genetic marker tests pursuant to Family Court Act § 532. The tests indicated a 99.9% probability of petitioner's paternity. Psychiatric evaluation revealed a belief on Ry's part that any relationship with petitioner would necessarily disrupt her relationship with Robin Y. and Sandra R. and might therefore undermine the legitimacy of her perception of the family unit. It also revealed that, since these proceedings were instituted, Ry has expressed a desire to end all contact with petitioner.

Family Court found by clear and convincing evidence, based upon the blood tests, that petitioner is the biological father of Ry. Nevertheless, citing the doctrine of equitable estoppel, the court refused to enter an order of filiation and dismissed the proceeding. The court characterized petitioner as an "outsider attacking her [Ry's] family [and] refusing to give it respect", concluding that "a declaration of paternity would be a statement that her family is other than what she knows it to be and needs it to be" and, therefore, "would not be in her best interests." (157 Misc 2d 858, 866-867.) The court added, "Even were there an adjudication of paternity, I would deny [petitioner's] application for visitation." *(Supra,* at 867.)

It is appropriate to begin with the observation that the effect of Family Court's order is to cut off the parental rights of a man who is conceded by all concerned—the child, her mother and the court—to be the biological father. The legal question that confronts us is not, as Family Court framed it, whether an established family unit is to be broken up. Custody of the child is not now, and is unlikely ever to be, an issue between the parties. Rather the question is whether the rights of a biological parent are to be terminated. Absent

strict adherence to statutory provisions, termination of those rights is in violation of well established standards of due process and cannot stand *(Matter of Ricky Ralph M.,* 56 NY2d 77, 81, citing *Santosky v Kramer,* 455 US 745).

The asserted sanctity of the family unit is an uncompelling ground for the drastic step of depriving petitioner of procedural due process *(Lehr v Robertson,* 463 US 248). Whatever concerns and misgivings Family Court and the dissenters may entertain about visitation, custody and the child's best interests, it is clear that they are appropriately reserved for a later stage of the proceedings. As the Appellate Division, Second Department observed in *Matter of Jean C. v Andrew B.* (86 AD2d 891, 892): "To the extent that paternity has been established by clear and convincing and entirely satisfactory evidence, section 542 of the Family Court Act mandates the entry of an order of filiation. The 'best interests of the child' are not jeopardized by the entry of such an order. Following an order of filiation, an order of support, as well as orders of custody and visitation, may or may not be entered, within the discretion of the court (Family Ct Act, §§ 511, 545, 549; cf. *Matter of La Croix v Deyo,* 108 Misc 2d 382). Further, a proceeding pursuant to section 384-b of the Social Services Law, which provides for the termination of parental rights, pursuant to a statutory scheme that takes into consideration the 'best interests of the child,' is not precluded by an order of filiation."

The reasoning advanced by the dissent to obviate further proceedings involves the predetermination of the very issues that would normally be resolved by hearings on visitation and, if warranted, termination of parental rights *(supra).* Without the order of filiation to which the law entitles him, petitioner lacks standing to seek visitation (Family Ct Act § 549) or challenge respondent's (and the dissent's) concept of what may or may not be in the child's best interests (Social Services Law § 384-b). Apparently convinced that petitioner could not possibly contribute anything beneficial to the court's consideration of this issue, the dissent would deny petitioner the right to his day in court. Moreover, a subsequent hearing is the appropriate method for respondent to seek an order of support (Family Ct Act § 545), the absence of which is of particular concern to the dissent. The record thus far is devoid of any suggestion that support from petitioner was ever sought, and it would appear from the asserted terms of the oral agreement between the parties and the tone of respondent's briefs that any offer

of support would have been regarded as an intrusion upon the family relationship among respondent, Sandra R. and Ry.

Even more disturbing is the suggestion that the judicial process will pose "severe traumatic consequences" to the child whose interests it is designed to protect. Petitioner is portrayed by the dissent as the villain of this case for having the temerity to request that Ry and her sister accompany him on an unsupervised visit to meet his parents, causing a "rift" and precipitating this litigation. The record, however, indicates that it was Robin Y. and Sandra R. who opposed this visit and does not reflect any initial resistance on the part of Ry. It was only some period of time after Robin Y. and Sandra R. refused petitioner any further visitation with his daughter that Ry developed overt animosity towards the man she had called "Dad" and regarded with great affection. As the Court of Appeals has noted, "The desires of young children, capable of distortive manipulation by a bitter, or perhaps even well-meaning, parent, do not always reflect the long-term best interest of the children" (Matter of Nehra v Uhlar, 43 NY2d 242, 249; see also, Friederwitzer v Friederwitzer, 55 NY2d 89, 94-95).

The apparent manipulation of an innocent child's affections and the obvious damage wreaked upon the once harmonious relationship with her father do not deter the dissent from the view that the child's "haunting fear" of being taken away from "the woman whom she has consistently thought of as her second parent" must have been instilled by petitioner. Whether Ry will come to regret the poisoning of her formerly amicable relationship with her father is beyond the meager ken of a court of law and must be consigned to the conscience of whoever must abide the consequences. It remains to be seen whether petitioner's is the only parent-child relationship to be damaged by this dispute.

The emphasis placed on custody, both by respondent and the dissent, is out of all proportion to its relevance to this proceeding. First, Thomas S. has never asserted a desire to gain custody of Ry. Second, as noted, custody and visitation are matters for subsequent hearings (see, Matter of Alison D. v Virginia M., 77 NY2d 651, 658 [Kaye, J., dissenting]). Finally, the extent of petitioner's involvement in Ry's life is at once characterized by the dissent as both inadequate and overly intrusive. He is vilified for failing to sufficiently undertake his parental responsibility to provide ongoing support for the child and her education, without any consideration for whether support was necessary, solicited or even deemed

desirable by her mother and Sandra R. He is criticized for having only a limited experience with the day-to-day events in his child's life, without regard for the three thousand-mile distance between residences or the degree to which access to the child was limited by respondent and Sandra R. At the same time, petitioner's desire to communicate and visit with his daughter is portrayed as a threat to the stability and legitimacy of the family unit constituted by Ry, respondent and Sandra R. It is distressing that petitioner, who seems to have exhibited sensitivity and respect for the relationship between respondent and her domestic partner, is proposed to be compensated for his understanding by judicial extinguishment of his rights as a father. Such a result is offensive to the Court's sense of equity. Moreover, such an injustice hardly serves to promote tolerance and restraint among persons who may confront similar circumstances. It discourages resolution of disputes involving novel and complex familial relationships without resort to litigation which, ideally, should only be pursued as a last resort.

No one would suggest that, in the typical case of divorce and remarriage of a mother, a father's parental rights should thereupon be subject to termination because his intimate involvement in the child's upbringing is no longer feasible or welcome. By the same token, the mere assertion of filiation by a biological parent will not prevent termination of parental rights where statutory criteria are met (Social Services Law § 384-b [4]; *Matter of Star Leslie W.*, 63 NY2d 136, 146-147).

It is clear that the dissent does not construe the issues presented by this case in the limited context of a filiation proceeding or even the more expansive proceeding for an order of visitation, which is the matter ultimately to be determined. Without apparent regard for the interests of the parties to this litigation, the dissent proceeds to analyze the issues from the context of an adoption, particularly the necessity for petitioner's consent. Thus, Domestic Relations Law § 111 is invoked to deny petitioner a protected paternal right on the ground that he failed to contribute to the child's support (subd [1] [d] [i]). Also prominently relied upon are cases which stand for the limited proposition that a child may be given up for adoption shortly after birth without any necessity that the unwed father consent or even be advised of the child's birth unless he has indicated a willingness to assume full parental responsibility *(Matter of Robert O. v Russell K.*, 80 NY2d 254, 259, 262, citing *Lehr v Robertson*, 463 US 248, 261, *supra),* a determination which rests on a

distinct statutory basis (Domestic Relations Law § 111 [1] [e]; *Matter of Robert O. v Russell K., supra,* at 261). These cases are inapposite both because the instant dispute arose when the child was some nine years old and because the issue is not whether the Federal Constitution bestows parental rights on petitioner, but whether he is to be afforded rights conferred by New York State statute *(cf., Quilloin v Walcott,* 434 US 246 [noncustodial, unwed father does not have absolute veto power over adoption]; *Caban v Mohammed,* 441 US 380, *revg Matter of David A. C.,* 43 NY2d 708 [gender-based distinction between consent requirements for parents under Domestic Relations Law § 111 (former [1]) unconstitutional]).

The first observation is the obvious one, that Sandra R. has not filed an adoption petition and that the issues presented by such a proceeding, including the necessity for petitioner's consent (Domestic Relations Law § 111 [2] [a]) are simply not before us *(see, Matter of Corey L v Martin L,* 45 NY2d 383, 391 [indispensing with parental consent to adoption, the best interests of the child are no substitute for a finding of abandonment]). While the question of the respective rights of a gay life partner vis-à-vis a biological parent presents a timely issue for consideration by the legislative and judicial branches of government, its resolution should only be attempted by a court upon a full record, in an adversarial proceeding in which both sides have been afforded the opportunity to brief the formidable issues presented—including whether reform of Domestic Relations Law § 111 is exclusively the province of the Legislature *(see, Caban v Mohammed, supra,* at 392, n 13). The development of the law is not aided by summary determination of novel controversies *(see, Quilloin v Walcott, supra,* at 253-254).

The other observation is that it is in no one's best interest to require a father, in the position of petitioner, to choose between asserting full parental rights, encompassing support and custody of the child *(Quilloin v Walcott, supra),* in order to achieve the limited relief sought—an order of filiation and, ultimately, visitation (Family Ct Act § 549). This Court would perform a disservice to the litigants by expanding the proceeding to place custody in issue. As a matter of sound appellate jurisprudence, the Court should limit its consideration to questions embraced by the relief actually sought and not attempt to address issues which may or may not arise in the course of future proceedings. The gratuitous interjection of custody, in particular, raises the very threat to the relationship between Ry and her mothers that respondent and the

dissent posit in support of the termination of petitioner's parental rights. Clearly, the resolution of this matter should not be predicated on avoiding judicial consideration of petitioner's right to relief that he has not thus far sought and which he might well never seek.

Family Court's disposition is no more compelled by the equities of this matter than by the law. The notion that a lesbian mother should enjoy a parental relationship with her daughter but a gay father should not is so innately discriminatory as to be unworthy of comment. Merely because petitioner does not have custody of his daughter does not compel the conclusion, embraced by the dissent, that he may not assert any right to maintain a parental relationship with her. While much is made by Family Court of the alleged oral understanding between the parties that petitioner would not assume a parental role towards Ry, any such agreement is unenforceable for failure to comply with explicit statutory requirements for surrender of parental rights (Social Services Law § 384; Family Ct Act § 516; *see, Dennis T. v Joseph C.*, 82 AD2d 125, *lv denied* 55 NY2d 792; *Matter of "Baby Boy P."*, 85 Misc 2d 1001), as the dissent concedes.

The case law urged by respondent to support estoppel against petitioner, to the extent that it is material under the unusual circumstances of this case, deals with the preservation of the legitimacy of a child *(Matter of Barbara A. M. v Gerard J. M.*, 178 AD2d 412, 413; *Matter of Ettore I. v Angela D.*, 127 AD2d 6; *Matter of Sharon GG. v Duane HH.*, 95 AD2d 466, *affd* 63 NY2d 859). As contemplated by statute (Family Ct Act § 417; Domestic Relations Law § 24 [1]), a child born out of wedlock will only be rendered legitimate by the subsequent marriage of the mother and a man admitting paternity or judicially declared to be the father. Such a prospect in this case is remote, as is the relevance of the cited authority. The sweeping change in the legal concept of legitimacy, as urged by amici curiae, is a prerogative of the Legislature, not the courts.

Family Court presumed to apply the doctrine of equitable estoppel to foreclose any attempt by petitioner to obtain judicial consideration of his rights as a parent. However, the doctrine is more appropriately applied against the mother than against petitioner *(Michel DeL. v Martha P.*, 173 AD2d 308, 309; *Matter of Boyles v Boyles*, 95 AD2d 95, 98). If respondent now finds petitioner's involvement in his daughter's life to be inconvenient, she cannot deny that her predicament is the result of her own action. Not content with the

knowledge of the identity of the biological father that her chosen method of conception afforded, Robin Y. initiated and fostered a relationship between petitioner and Ry. However strenuously this relationship may be gainsaid by respondent, its nature, duration and constancy during the six years prior to the commencement of this proceeding amply demonstrate petitioner's interest and concern for his child (Social Services Law § 384-b) so as to preclude summary termination of his parental rights. Nor, given that Ry has known petitioner to be her father since the age of three, is there any credibility to the suggestion that mere acknowledgement of petitioner's legal status will result in a shock to the child's sensibilities (compare, Terrence M. v Gale C., 193 AD2d 437, lv denied 82 NY2d 661). According to the testimony of the court-appointed psychiatrist, Ry's recently expressed desire to sever contact with petitioner, coinciding as it does with the onset of the instant dispute, is based on concerns communicated to her by Robin Y. and Sandra R. These fears are based on the misapprehension that visitation by petitioner necessarily poses an immediate threat to the stability of the household. In any event, Family Court's precipitous pronouncement notwithstanding, visitation is a matter yet to be determined, and the value of therapy in reestablishing the relationship between Ry and her father is an appropriate consideration in that context (Wolfson v Minerbo, 108 AD2d 682). Finally, entry of an order of filiation has the advantage of supplying a further source of support, should the necessity arise, together with the potential for substantial inheritance (Michel DeL. v Martha P., supra, at 309).

We reject the dissent's view that the alleged agreement between the parties constitutes evidence of a lack of committment to his child on the part of petitioner. As the dissenters concede, legal impediments and public policy considerations bar enforcement of the oral agreement, and it can therefore be accorded no force or effect. It is the longstanding rule of equity, now extended to law, that the facts be viewed in their fullest (CPLR 3025 [b]; Siegel, NY Prac § 237, at 353 [2d ed]). The Court cannot simply ignore the significant events that have transpired since Ry's third birthday. In any event, we regard the determination of this matter in any manner that departs from the express procedures delineated in article 5 of the Family Court Act as a violation of petitioner's statutory and Constitutional rights.

Having initiated and encouraged, over a substantial period of time, the relationship between petitioner and his daughter,

respondent is estopped to deny his right to legal recognition of that relationship. The provisions of Family Court Act § 542 (a) are clear and unambiguous and, therefore, there is no room for judicial interpretation. Having found that petitioner is the father of Ry R.-Y., Family Court was commanded by statutory direction to enter an order of filiation *(Matter of John H. v Suffolk County Dept. of Social Servs.,* 174 AD2d 669, 670, citing *Matter of Jean C. v Andrew B.,* 86 AD2d 891, 892, *supra; see,* McKinney's Cons Laws of NY, Book 1, Statutes § 76). Concur —Rubin, Nardelli and Williams, JJ.

Rosenberger, J. P., and Ellerin, J., dissent in a memorandum by Ellerin, J. The question before us on this appeal is whether petitioner must be granted an order of filiation, pursuant to Family Court Act § 542, establishing his paternity of the child borne by respondent in November, 1981 as a result of having been artificially inseminated with petitioner's sperm or whether the doctrine of equitable estoppel may be applied to preclude the issuance of such order. The complexity of the human relationships that permeate this case and the contemporary reality of millions of households that maintain alternative family lifestyles* strongly militate against the rigid, abstract application of legal principles, not designed for situations such as this, in a way that will grievously impact upon an innocent child, now 12 years of age. This case also demonstrates, as do most emotionally charged situations, the inadequacy of current law and litigation as instruments capable of satisfactorily accommodating the competing desires and interests of each of the parties involved. Since, however, I believe that the overriding factor which must guide us is the best interests of this child, I dissent and would affirm the trial court's sensitive and well founded decision which denied a declaration of paternity to petitioner sperm donor on the basis of equitable estoppel.

The facts as found by the trial court are as follows. The child Ry was conceived by respondent Robin Y. using sperm donated by appellant Thomas S., a gay man, while Robin was living in a stable life partnership relationship with another lesbian mother, Sandra R., and Sandra's then infant child Cade. At the time of appellant's providing his sperm, it was agreed, albeit not in writing, that he would have no parental rights or obligations and that the child would be brought up with Cade in a 2 parent household with 2 mothers. Appellant

---

* *See, Matter of Alison D. v Virginia M.* (77 NY2d 651, 657-658 [Kaye, J., dissenting]), and authorities therein cited.

further agreed that he would make himself known to the child if the child wished to know the identity of her biological progenitor.

Notwithstanding the agreement, it is the manner in which the parties acted during the period from the child's birth up to the time of the commencement of this proceeding that is of critical significance. For the first 3 years of Ry's life there was virtually no contact with appellant. He was neither present at, nor involved with any arrangements for or costs of, her birth. His name was not on her birth certificate, he was not in any way involved in her care or support nor did he indicate the slightest desire to learn of her progress or condition even though for the first 8 months of her life Ry and her family resided in San Francisco where appellant lived.

It was only in 1985 when Cade, then almost 5 years old, began to ask about her biological origins, that contact was made with both Cade's sperm donor and with appellant, both of whom lived in California. At that time Ry was almost 3½ years old. In the ensuing 6 years there were periodic contacts between appellant and both children, usually with both mothers present and always at the complete discretion of the mothers.

The record clearly establishes that for Ry's first 9½ years of life the appellant at no time sought to establish a true parental relationship with her either by way of seeking to legally establish his paternity and assuming the responsibilities and obligations which that status entailed or by any involvement in her upbringing or schooling or by attempting to provide any support for her. He was not there when she cut her baby teeth, started to walk, was sick or in need of parental comfort or guidance, nor did he seek to involve himself in the everyday decisions which are peculiarly the domain of parents—decisions as to what schools she should attend, what camps, what doctors should be consulted, the extent of her after school and social activities, the need for tutors and the like. Perhaps Ry herself best stated it when she said that to her a parent is a person who a child depends on to care for her needs.

The net of petitioner's relationship with Ry during the 6 years that he occasionally saw her until she was almost 10 years old was that of a close family friend or fond surrogate uncle who, while acknowledging that he was her biological sperm donor, fully recognized that her family unit consisted of her two mothers and her sister Cade and that he was not a

family member of that unit. Throughout this period he fully acquiesced in the mothers' arrangement for meetings—i.e., to include all 4 members of the R.-Y. family and with Cade to be treated by him in precisely the same way as Ry. While respondent Robin Y. was always agreeable to continuing periodic meetings and contacts with appellant on the same basis, it was appellant who summarily sought to alter this *modus operandi* of the preceding 6 years. He asked that the children visit him by themselves, without the other members of those whom he had always recognized as her family, so that he could introduce Ry to his own biological family, including his parents and siblings. He made clear that he would not feel comfortable introducing the mothers to his family. After respondent refused to accede to this attempt to markedly alter the prior course of the relationship between appellant and Ry's family, fueled by respondent's apprehension of future legal proceedings seeking to undermine that family relationship, appellant filed the instant petition for filiation.

The trial court, sensitive to the issues involved, appointed a law guardian for the child and obtained the agreement of all parties to submit the child to a psychiatric evaluation. Both the law guardian and the psychiatrist strongly recommended against the declaration of paternity and further recommended that there be no court-ordered visitation. Their intensive examination of Ry's progress while raised with the family unit that she has known since birth showed that she, and Cade, in addition to having a very close and warm sisterly relationship and a warm and loving relationship with both their mothers have also functioned well in the private school which they attend and that they have strong peer relationships. Ry is a well adjusted child, who, despite experiencing some external incidents of intolerance and insensitivity to her family lifestyle, views that family as a warm, loving, supportive environment. Most significantly, Ry views this proceeding as a threat to her sense of family security. She is angry at petitioner and feels betrayed by him because she and her family had counted on him as a supporter of their unconventional family unit. The thought of visiting appellant, and her deep-seated fear that he might seek custody of her, have caused Ry anxiety and nightmares and the psychiatrist opined that forced visitation with appellant would exacerbate that anxiety and have untoward consequences. The law guardian in a lengthy and well-documented brief details the specifics of the relationships involved and the completely non-parental role occupied by appellant until the instant proceeding was commenced when

Ry was almost 10 years old. Both the law guardian and the court-appointed psychiatrist make clear that the best interests of Ry, now 12 years old, will be served by an affirmance of the denial of filiation, which will also eliminate Ry's custody concerns.

At the outset, it must be emphasized that this proceeding was brought for the purpose of establishing, in the first instance, petitioner's parental status. While, concededly, petitioner provided the sperm for the artificial insemination that resulted in Ry's birth, petitioner at no time, for the almost 10 years prior to the commencement of this proceeding, established any paternal rights either by way of a legal proceeding or by way of fulfilling any of the duties and responsibilities incidental to parenthood. In that setting, the majority's characterization of the denial of the petition as akin to the "termination of [petitioner's] parental rights" is both puzzling and inaccurate. Until it can be established that petitioner has some parental rights, the very relief sought in this proceeding, the question of any "termination" of petitioner's rights never arises and the majority's recourse to Social Services Law § 384-b, governing termination of parental rights, is misplaced.

Nor, it should be made clear, is this case in any wise a referendum on the comparative parenting abilities of lesbian mothers versus gay fathers, a gratuitous rhetorical inquiry posed by the majority. That petitioner is a gay man is wholly irrelevant to the question of whether his conduct for a period of almost 10 years during which he acquiesced in, and indeed fostered, Ry's belief that her family unit consisted of her 2 mothers and her sister Cade and that he did not occupy, nor seek to exercise, any parental or family role, should preclude his present attempt to establish parental status. It is the import of appellant's conduct and not his sexual orientation that is controlling. An identical standard would apply if any or all of the parties involved in this case were heterosexual.

The threshold issue that must first be determined is what rights, if any, arise from the fact that petitioner was the sperm donor and paternal biological progenitor of the child Ry. The Court of Appeals has made clear that absent " 'a full commitment to the responsibilities of parenthood' " the mere existence of a biological link does not merit constitutional protection (*Matter of Robert O. v Russell K.*, 80 NY2d 254, 262, quoting *Lehr v Robertson*, 463 US 248, 261). Thus, an unwed biological father does not automatically have parental rights which must be recognized by the State independent of the child's best interests, since such rights come into existence

only if the father has sufficiently grasped the opportunity to "promptly manifest * * * his willingness to take on parental responsibilities" and it is only when "the opportunity, of limited duration, to manifest a willingness to be a parent" is grasped that an interest arises worthy of protection as a matter of due process *(Matter of Robert O. v Russell K., supra,* at 266; *see also, Quilloin v Walcott,* 434 US 246; *Caban v Mohammed,* 441 US 380; *Lehr v Robertson,* 463 US 248, *supra).*

While providing support for the child, and the child's education, would appear to be a minimal requirement for the manifestation of parenthood *(see,* Family Ct Act § 513), the criteria which are particularly relevant in determining whether an unwed biological father has sufficiently undertaken his parental responsibilities to give him a protected parental interest may be garnered by reference to Domestic Relations Law § 111 which governs adoptions and delineates the various criteria which must be met before an unwed father has any protected right vis-à-vis the child. That statute provides that when the child is more than six months old, the father has a protected parental right to the extent of requiring his consent to the child's adoption, *only if* he has, "maintained substantial and continuous or repeated contact with the child as manifested by: (i) the payment by the father toward the support of the child of a fair and reasonable sum, according to the father's means, and either (ii) the father's visiting the child at least monthly when physically and financially able to do so and not prevented from doing so by the person or authorized agency having lawful custody of the child, or (iii) the father's regular communication with the child or with the person or agency having the care or custody of the child, when physically and financially unable to visit the child or prevented from doing so by the person or authorized agency having lawful custody of the child." (Domestic Relations Law § 111 [1] [d].)

In this case there is no question that petitioner has never sought to contribute to the ongoing support of the child, or to see to her educational or other needs despite the fact that he is a professional of substantial means. On the contrary, all of the child's economic and educational needs have been provided for through her mothers and she has enjoyed a comfortable standard of living. Nor, after not seeing the child at all for the first 3 years of her life, has petitioner ever sought to visit the child on anything close to a monthly basis. His failure to do so cannot be attributed to respondent since, until

very recently, the pattern of occasional visits was one with which he was in full agreement. Whether viewed within the framework of the statutory criteria or the common understanding of what parenthood entails vis-à-vis the multiple daily facets of a child's life, petitioner's conduct until the commencement of this proceeding fell far short of manifesting the willingness to take on the parental responsibilities necessary to invest him with any constitutionally recognized parental "rights" which could be terminated subject to the provisions of Social Services Law § 384-b.

Petitioner argues that, *dehors* any constitutional considerations, Family Court Act § 542 requires that an order of filiation be granted because he is unquestionably the child's biological progenitor. Irrespective of the seemingly mandatory language of Family Court Act § 542, biological fatherhood does not create an absolute right to an order of filiation, and, indeed, the courts of this State have frequently applied the doctrine of equitable estoppel to forestall the entry of such an order regardless of biological relation *(see, Matter of Sharon GG. v Duane HH.,* 95 AD2d 466, 467-468, *affd* 63 NY2d 859; *Terrence M. v Gale C.,* 193 AD2d 437, *lv denied* 82 NY2d 661; *Matter of Ettore I. v Angela D.,* 127 AD2d 6).

An equitable estoppel will be applied in the interest of fairness where the misleading words or conduct of a party induce justifiable reliance by another to his or her substantial detriment, and may include a situation where the failure of a party to promptly assert a right creates circumstances making it inequitable to permit the right to be exercised after considerable time has elapsed *(Matter of Ettore I. v Angela D., supra,* at 12, citing *Nassau Trust Co. v Montrose Concrete Prods. Corp.,* 56 NY2d 175, 184; *see also,* 57 NY Jur 2d, Estoppel, Ratification, and Waiver, §§ 13, 15, 27).

Appropriate circumstances for application of an estoppel in a paternity proceeding have been found in a wide variety of situations. For example, in *Matter of Ettore I. v Angela D. (supra),* the petitioner was estopped from asserting paternity where he had taken no action for 3 years and both the child and the mother's husband had regarded the child as the husband's own and had formed a parent-child relationship.

In *Terrence M. v Gale C. (supra),* petitioner was estopped from attempting to establish his paternity where he had failed to support or attempt to establish any relationship with the child for almost the entire period of the child's minority. In that case, the person whom the child had previously thought

of as her father had never been married to her mother and was, at the time of the proceeding, deceased.

Equitable estoppel has also been invoked to prevent a mother from seeking to have her husband, who had always performed the role of and assumed the responsibilities of a father, be replaced by another man who was a stranger to the child *(Matter of Sharon GG. v Duane HH., supra; Michel DeL. v Martha P.,* 173 AD2d 308) and to prevent men who had acknowledged their paternity and acted as fathers from challenging that status in order to be relieved of support obligations *(see, Matter of Barbara A. M. v Gerard J. M.,* 178 AD2d 412; *Vito L. v Filomena L.,* 172 AD2d 648).

This leads to the issue of whether an estoppel should be applied under the facts of this case. While frequently paternity cases which have involved the application of equitable estoppel have concerned the preservation of the legitimacy of the child in its legal definition, no authority is cited to support the majority's conclusion that the preservation of legitimacy in its legal sense is a *sine qua non* for the imposition of equitable estoppel. On the contrary, the paramount purpose of the equitable estoppel doctrine is to promote fairness and justice, and in considering whether it should be applied in a paternity case the overriding consideration is whether imposition of the estoppel will serve the best interests of the child *(see, i.e., Matter of Ettore I. v Angela D., supra)*. It is also significant that the appropriate emphasis in a case seeking to establish paternity must be upon the welfare of the child and that the primary purpose of establishing paternity is to insure that adequate provision will be made for the child's needs in accordance with the means of the parents *(Matter of L. Pamela P. v Frank S.,* 59 NY2d 1, 5). Thus, both in considering whether to grant a filiation order and, alternatively, in considering whether to apply equitable estoppel to deny such an order, the predominating concern must be the welfare of the child. This means that even if equitable estoppel is applied to forestall a purported father's petition for a filiation order, that determination would not subsequently preclude the commencement of a paternity proceeding by any other party who is entitled to originate such proceeding pursuant to Family Court Act § 522, including the mother, the child herself or a public welfare official. Thus, while one party may be estopped from asserting paternity, should the situation change, and a declaration of paternity be found to be in the best interests of the child, there would be nothing to prevent its entry.

If the child's best interests are to be the touchstone of the

analysis, the attempts by both parties to argue the equities of their own respective personal positions are not germane. It is neither petitioner's nor respondent's feelings of aggrievement that are the determinative consideration, although one may sympathize and understand those feelings. Rather, it is the impact which petitioner's past assurances and representations to Ry during her first 9½ years of life—as to who her family were, how it functioned and his non-family status—have had upon her stability and security and the consequences which would stem from permitting a dramatic abrogation of those representations by giving petitioner family status with all that it entails. While the child has always known that petitioner is her biological progenitor, it had consistently been demonstrated by petitioner himself that this factor did not confer upon him any authority or power over her life, that it did not mean that Sandra R. was less her mother than Robin Y., and that it did not mean that her sister was not her full sister. To now grant him the standing to claim the very considerable authority and power held by a parent, against her wishes, would change her life in drastic ways. For this reason, I believe that the elements of misrepresentation, reliance and detriment have clearly been established and that the evidence demonstrates that an order of filiation is not in this child's best interests. Under these circumstances, the doctrine should be applied.

The evidence overwhelmingly supports this conclusion. The psychiatric testimony clearly demonstrated that an order of filiation would have an adverse effect. Not only does the child view the prospect of such an order as an attack on her family, but she affirmatively fears the fact that parental authority over her life may rest in the hands of someone whom she had never viewed as a parental figure and whose wishes are diametrically opposed to those of the two people she does view as her parents. Furthermore, it is important to point out that the court-ordered psychiatrist clearly testified that he did not believe that the child's fears were the result of "brain-washing", but were consistent with her long held commitment to her family. This was among the reasons he recommended against orders of filiation and visitation.

Moreover, petitioner's past actions do not support a finding that his application for paternity is part of a longstanding commitment to his role as a father that might tend to override concerns that his potential participation in the child's life would be disruptive. While petitioner's initial oral agreement to forego the initiation of any contact with the child is clearly

not binding, it is certainly evidence that petitioner's commitment to the child has not been consistent. Additionally, petitioner's willingness to have virtually no contact with the child until the age of 3 and, after that, to seek no contact beyond that which was suggested by others also bespeaks a less than intense interest and strongly supports the conclusion that the child herself has consistently been led to believe by petitioner that he does not play a parental role in her life. For the 6 years during which he and the child had contact, petitioner never sought more visits than those arranged by respondent and Sandra R., which were frequently during vacation periods and shared with a number of other friends. These visits have not totalled more than 25 over the course of 6 years. Nor did petitioner, either during visits or at any other time, seek to participate in any day-to-day care of the child or in any of the crucial decisions involving the child's life, such as her schooling, her religious upbringing, her medical care. Another factor for consideration must be petitioner's failure over the course of those years to attempt to provide any financial support for the child or to provide for her future. While this child is clearly well cared for without petitioner's financial participation, it would nevertheless lend support to petitioner's claim that his role in the child's life will be a positive one if he had ever, prior to the initiation of this proceeding, considered it a priority to at least attempt to confer upon her the additional benefits which his financial contributions could have provided.

Also significant is the import of the incident which led to the rift which ultimately led to the instant litigation, i.e., petitioner's insistence on bringing the child and her sister to visit his parents and siblings without respondent and Sandra R., which dramatically demonstrated to the child that petitioner is no longer supportive of her family unit and seeks to abrogate the family setting in which she has been nurtured since birth. Such an assault upon the child's feelings of security is particularly devastating to one on the threshold of adolescence.

Furthermore, and perhaps most important, a declaration of paternity in this case would be counter to this child's interests because it clearly would be only the first step in ongoing litigation which will inevitably cause severe traumatic consequences to the child and her family. Indeed, the majority's decision has already provided for further litigation in its remand for a decision on visitation. A declaration of paternity creates a platform for petitioner, as well as his parents and other members of his family, who will, by means of the order,

become the child's legal relations, to seek changes in visitation and, of course, to seek custody. Indeed, even were visitation never to be granted and further litigation never to succeed, the constant, frightening potential for it is a burden that this child, who is already aware that her family is vulnerable to attack on a number of fronts, should not have to bear. It is clear that this specific fear has already taken its toll. According to the psychiatric testimony, the child believes that the order of filiation would mean that "anytime [petitioner] didn't like something he could sue". In particular, the psychiatric testimony emphasized Ry's haunting fear of the consequences should her birth mother die or become unable to care for her and the resulting ambiguous status of the woman whom she has consistently thought of as her second parent.

Finally, it should be noted that, contrary to respondent's arguments, the fact that the child was conceived by artificial insemination is wholly irrelevant on the question of whether or not petitioner has acquired any parental rights. In this State, the only differentiation drawn between the familial status of a child conceived as a result of artificial insemination, as opposed to intercourse occurs when the child is born to a woman who makes a mutual decision with her husband to conceive a child in this fashion, which is memorialized in a written, signed statement and where the insemination is performed by a licensed physician who certifies that he has performed the procedure. In such a case, Domestic Relations Law § 73 automatically bestows the parental rights of the biological father upon the mother's husband, who is deemed the legal father for all purposes. That statute, of course, has no application to this case and the conclusion that petitioner has no protected parental rights is predicated upon his failure for almost 10 years to manifest his willingness to assume the responsibilities of parenthood or to be a parent irrespective of the manner of the child's conception.

For all these reasons, I believe that the evidence overwhelmingly supports the Family Court's decision that the entry of an order of filiation would not be in this child's best interests and that there should, therefore, be an affirmance. *[See, 157 Misc 2d 858.]*